# UNITED STATES DISTRICT COURT
## FOR THE
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br>Plaintiff               )<br>)<br>)<br>-vs-              )<br>)<br>)<br>**EDMUND JOHN SEGGERMAN**  )<br>Defendant         ) | Docket No. 0208 1:13CR00216-001(PKC)<br><br>SENTENCING MEMORANDUM |

## MEMORANDUM ON BEHALF OF EDMUND JOHN SEGGERMAN
## IN AID OF SENTENCING

**ATTORNEY FOR THE DEFENDANT**
Frank Agostino
Agostino & Associates
14 Washington Place
Hackensack, New Jersey 07601
201.488.5400
fagostino@agostinolaw.com

Date: June 12, 2019

TABLE OF CONTENTS

I.           Introduction . . . . . . . .. . 3

II.         Background of the Offense . . . . . . .5

III.       Personal and Professional Background . . . . .7

    A)   Personal Background—Early Years . . . . . 7
    B)   John's Formative Years Were Influenced by Dysfunctional
       Family Circumstances . . . . . . . 9
    C)   John's Behavior was Influenced by His Siblings. . . 11
    D)   John's Letters Demonstrate His Personal and Professional Qualities .12
    E)   John is a Devoted Father, Husband and Friend . . .15
    F)   John is a Contributing Member of His Community . . 18

IV.      The Availability of Probation . 21

    A)   The Nature and Circumstances of the Offense . . .22
    B)   The History and Characteristics of the Defendant . . 23
    C)   Kinds of Sentences Available . . . . . 24
    D)   The Need to Avoid Unwarranted Sentence Disparities . .24

V.       A Sentence of Probation with Community Service is Appropriate
in John Seggerman's Case. . . . . . . . 25

    A)   Support for Community Service Sentences . . . 25
    B)   Community Service is an Appropriate Sentence for John Seggerman .28

VI.     Conclusion . . . . . . . .30

# I.
## INTRODUCTION

This memorandum is respectfully submitted on behalf of Edmund John Seggerman (John Seggerman) in connection with his sentencing scheduled for June 26, 2019. As the Court is aware, Mr. Seggerman plead guilty in March 2013 to Conspiracy to Defraud the United States, Making and Subscribing to False U.S. Individual Tax Returns, and Making and Subscribing to a False Estate Tax Return.  These charges are based on an inheritance left to him and his family by his father in an offshore account. These charges are out of character for John Seggerman and he has cooperated and expressed genuine remorse for his actions. He now stands before the Court asking for a fair and compassionate sentence that, as the Supreme Court mandates, "fit(s) the offender and not merely the crime," *Pepper v. United States,* 562 U.S. 476, 488 (2011) (quoting *United States v. Williams,* 337 U.S. 241, 247 (1949)), and that comports with Congress' explicit directive that the sentence be "sufficient but not greater than necessary to achieve the purposes of sentencing." 18 U.S.C. § 3553(a).

As the letters submitted by family, friends, neighbors, colleagues and community members indicate, John Seggerman is a dedicated husband, father and a trusted and loyal neighbor and friend. As the youngest of six children, John Seggerman has had significant emotional difficulties in his formative years for which he entered therapy for almost a decade and has come out as a much stronger person. Whether these emotional difficulties contributed to his illegal behavior is difficult to judge but, in reviewing his background, it is understandable how voiceless and uncertain John felt about disagreeing with his father's wishes for his estate, the professional advice given to him and his family, and his siblings' desires.  . By way of

explanation – not excuse - John took what at that time was the path of least resistance - allowed himself to fall into the "youngest child role" and obey the wishes of a dysfunctional family.

Through this memorandum and with the observations made in the Presentence Report, the Court will see that today John is a strong father and community member who is living a simple life dedicated to family, friends and community.  In fashioning a sentence, we ask the Court to recognize the challenges he has faced in his personal and professional life and extraordinary acceptance of responsibility demonstrated by John's payment of the tax, and by his cooperation against his siblings.

Ultimately we ask the Court to make an individualized assessment of Mr. Seggerman's life. As the Supreme Court has recognized,

> It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and punishment to ensue.

*Koon v. United States,* 518 U.S. 81, 113, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996). "Underlying this tradition is the principle that 'the punishment should fit the offender and not merely the crime.' " *Pepper v. United States,* 562 U.S. 476, 487, 131 S.Ct. 1229, 1240, 179 L.Ed.2d 196 (2011) (quoting *Williams v. People of State of N.Y.,* 337 U.S. 241, 247, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949)).

Along those lines, Judge Rakoff has observed:

> But, surely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance. This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, "the history and characteristics of the defendant."

United States v. Adelson, F.Supp.2d 506, 513-514 (S.D.N.Y. 2006). By this Memorandum, counsel respectfully requests that the Court review the totality of Mr. Seggerman's life and impose an appropriate sentence commensurate with not just his crime, but with his remorse, cooperation and the history and characteristics of his life.

## II.
### BACKGROUND OF THE OFFENSE

In May 2001, John's father, Harry Seggerman, passed away leaving assets outside the United States. In August 2001, John and his family members met with a Swiss lawyer and a London-based investment professional who had been advising his father before his death. At that meeting, they told the family members of their father's intention to keep most of the assets offshore and not report them to the IRS. The family members agreed to follow their advice. Over the years, these funds remained offshore and were not reported to the IRS, except that John requested funds to be transferred to him during a period where he had a mental health breakdown and was largely unemployed for approximately 18 months. He was seeing a psychiatrist twice a week and needed money for living expenses.

The IRS initially began an investigation of Suzanne Seggerman and then of the entire family. They have each plead guilty to their violations. John has expressed sincere remorse, paid his unpaid tax, and has cooperated fully with the United States government.

In December 2009, John applied for the IRS's Voluntary Disclosure Program to disclose his offshore account. Though he was initially pre-cleared into the program, his application was later rejected. In 2010, he received a subpoena from the government for records related to this case and he instructed his attorney to meet with the government to discuss ways he could

cooperate. In 2012, he met with the government and fully disclosed his and his siblings'
activities. Since then, he has been cooperating with the government which led to the successful
prosecution of the investment advisor, Michael Little. John testified at Mr. Little's trial, who was
convicted in April 2018 of 19 counts of criminal behavior.

A defendant's cooperation with the government's investigation and his true remorse,
whether exceptional or not, are valid and independent bases for downward variances. *See United
States v. Stewart,* 590 F.3d 93, 140 (2d Cir. 2009) ("[O]f course, use of a defendant's cooperation
to justify significant variances or departures from the otherwise applicable Guidelines
calculations is commonplace."); *United States v. Howe,* 543 F.3d 128, 138 (3d Cir. 2008).

John deeply regrets and feels tremendous shame and remorse. John pled guilty to this
crime and has cooperated fully with the United States government. As close friend, Lauren
Camilli, states:

> I would characterize myself as a somewhat cynical New Yorker
> who after a long career in ethics and compliance investigating
> allegations of wrongdoing, doesn't trust many people in this
> world…I know the difference between someone who does
> something wrong because of their character versus a good person
> who made a mistake…John is indisputably the latter category and
> is a good person that made a mistake many years ago…John has
> pled guilty, completely cooperated with the government, and
> accepted full and complete responsibility. John has suffered greatly
> from this process and I have seen firsthand, having unbearable
> stress and remorse for his past actions.[1]

Family friend, LeeAnn Flynn Hall echoes this when she writes of John's remorse, "We
know the heartache, the shame and the embarrassment he carries with him." His wife Patricia
also speaks of John's regret and remorsefulness when she describes the connection between

---

[1] This quotation and those that follow are taken from reference letters written on John Seggerman's behalf. These
letters can be found in Exhibit A.

"...the physical and emotional toll of [John's] shame..." and his diagnosis of Crohn's disease and chronic insomnia.

As John stated in his presentencing report dated April 12, 2019, "Although I initially disagreed with this decision, I succumbed to my siblings and eventually agreed to go along. I knew it was illegal, and regret my participation. I am ashamed and humiliated by my actions." He then continues:

> I accept full responsibility for my legal actions. This behavior was totally out of character for me and was a complete aberration in the way I have lived my life. I have worked hard to be a good citizen, husband, and father (PSR, p. 11).

John Seggerman constantly carries the humiliation and guilt of his past actions, and he is unlikely to ever re-offend.

### III.
#### PERSONAL AND PROFESSIONAL BACKGROUND
#### OF JOHN SEGGERMAN

**A) Personal Background—Early Years**

John Seggerman was born Edmund Gurney Seggerman on June 25, 1963 in Norwalk, Connecticut; he is the youngest of six children of Anne and Harry G.A. Seggerman. His mother changed his name to Edmund John Seggerman as a child because she wanted him to be named after Pope John XXIII. Today, people call him John Seggerman.

John's father was a graduate of Princeton University and spent most of his career as an investment advisor. Harry Seggerman began his career as an investment advisor with Fidelity Investments. Harry Seggerman founded International Investment Advisors (IIA) and was one of the first in the United States to create a fund that invested in Japan. In the early 1990's, he also invested in South Korea. John's mother, Anne, grew up in France and California. The couple married in 1951, and their first daughter, Patricia, was born in 1952. The couple then had three

more children in three years—Henry in 1953, Marianne in 1954, and Yvonne in 1955. Anne stayed home with the four young children, all under the age of four, while Harry traveled, sometimes overseas for extended periods of time. Some years later, in 1962, Harry and Anne's fifth child, Suzanne was born, and 10 months letter, John, the couple's sixth child arrived.

John and his family lived in Westport, Connecticut where he attended Hillspoint Elementary School. John's family then moved to Fairfield, Connecticut where John attended a private, all-boys school. Starting in tenth grade, John went to the Taft School, a boarding school in Watertown, Connecticut. All his siblings except Patricia went to boarding school for high school. John graduated from the Taft School in 1981 and went to Colgate University, where he graduated in the spring of 1985 with a Bachelor of Arts degree in political science and a minor in economics.

During his college years, John worked summers as a camp counselor in Vermont, and in the summer of 1984, John worked in Washington, DC as a volunteer intern on the Reagan-Bush presidential campaign. After college, in 1985, John moved to Washington, DC where he worked as a research assistant with the United States Department of Commerce. He then worked in research for the National Republican Senatorial Committee. From there, John worked as a legislative assistant to several United States congressmen and senators: Congressman Wally Herger of California, Congressman Ronald Machtley of Rhode Island, Senator John Chafee of Rhode Island, and then, after Senator Chafee's death in October 1999, his son, Senator Lincoln Chafee, also of Rhode Island. He worked for Senator Lincoln Chafee until spring of 2004 when he left his job in the aftermath of a mental health breakdown and pursued a career in real estate. In the spring of 2005, John earned his real estate license and worked as a realtor. In March 2016,

John joined Keller Williams Realty in Falls Church, Virginia; today, he continues to work with this firm as a realtor.

John met Patricia Teck in December 2006, and the two married on April 24, 2009 in Washington, DC. Patricia grew up in Montgomery County, Maryland and is a 1998 graduate of Colgate University; she holds a Bachelor of Arts degree in political science and earned her law degree at the University of Maryland's School of Law in 2002. Patricia works part-time as a realtor with Keller Williams Realty. The couple's first child, ███████ was born on ███████ ███████ He ███████ ███████ the ███████ ███████ ███████

### B) John's Formative Years Were Influenced by Dysfunctional Family Circumstances

John is the sixth child of a wealthy businessman and a philanthropic mother. He grew up in an affluent town in Connecticut, attended private schools, and landed in Washington, DC to work on Capitol Hill, However, John's upbringing is also dark, challenging, unhappy, dysfunctional resulting i███████ hat negatively affected his professional and personal relationships.

From 1952 to 1955, John's mother and father had four children. Seven years later, in 1962, John's sister, Suzanne, was born, and John was born just ten months later. Because there is a seven-year gap between Suzanne and John's older siblings, his family was one family with two sets of children. While John's father was an successful investor in the business world, John reports that his father died in May 2001 from complications due to alcoholism and diabetes. John's mother lives in Trumbull, Connecticut, but John does not have contact with her. When John was an infant, his eldest sister, Patricia, was diagnosed with cancer and had part of her leg

amputated because of the disease. When he was a young boy growing up, he remembers often

seeing Patricia cry hysterically. One night an ambulance took Patricia to the hospital for

██████████████████████████████████████████████████████████ John was seven

years old. Growing up, John's mother was an devout Catholic actively involved in religiously

oriented global philanthropy and who was vigilant about being a good Roman Catholic. She was

highly focused on her charitable work and Patricia's care. He and his next closest sibling,

Suzanne, were often left on their own or with a variety of caregivers. John's mother's cousin,

Patrick Loupe, who has known John his entire life, describes John's upbringing in his letter to

the Court:

> At a very early age, [John's] eldest sister ██████████████
> was ████████████████████████ which she remains
> afflicted to this day. His ████████████████ coupled with
> parents who were already ill-equipped to properly care for six
> children (John being the youngest) made for a bleak outlook. John
> was neglected during his childhood, as his parents employed a
> number of babysitters/nannies while pursuing their own interests
> outside the family. In addition, during some very vulnerable years
> John regularly witnessed his sister's ███████████████ arrowing
> for a youngster, as the two shared a home in Connecticut.

One regular babysitter, Kim DiQuattro, cared for John from age 10 to age 15 when John

left home to attend boarding school. Ms. DiQuattro was John's primary caregiver during his

formative years; she was also the one to take John on his college tours and help him prepare for

college.

With his father's extensive business travel away from home and his alcoholic behavior

when he was home, along with his mother's time and attention focused on religious pursuits and

care of Patricia, John experienced a fair amount of turmoil as a young child neglected by both of

his parents. Many adult children who grow up in neglectful, often alcoholic family environments,

experience tremendous emotional turmoil in their adult years. John's childhood affected his

ability to function as a fully, self-actualized adult. At a time of life when most young adults are venturing into chosen careers, achieving independence from one's family of origin, and entering into meaningful relationships with a significant other, many who come out of dysfunctional beginnings struggle with this next developmental stage of becoming an adult. Many suffer with mental health issues like depression; others cannot commitment to a relationship with plans to build a future and family of their own. John's adult years mirror this typical pattern of adult children of alcoholics. While John succeeded working for various legislators on Capitol Hill, he grappled with depression for many of his early adult years. In June 1990, at age 27, John suffered a ███████████████████ he took a month-long leave from work due to ████████ He found himself unable to commit to any long-term romantic relationships.  Years later, in January 2004 he suffered a more serious breakdown which contributed to his departure from his job in the U.S. Senate and a significant period of unemployment. Eventually John looked for ████████████████████ to deal with his dysfunctional childhood and spent time working through and changing unhealthy behaviors. Today, John is a happily married man with two young children and a stable, successful career as a realtor.

### C)  John's Behavior was Influenced by His Siblings

All those years of childhood trauma took another toll on John's life. John and three of his five siblings are in legal trouble for tax evasion. The Seggerman children's father died in May 2001, leaving behind a significant amount to be divided among Harry Seggerman's wife, Anne, and five of their six children. John's older sister, Marianne, disassociated herself from the family many years ago. His parents viewed Marianne as a difficult child to raise, and as a young boy, John saw how Marianne bore the brunt of their parents' dysfunctional anger and frustrations. Marianne was disinherited by her father in his will.

With professional advice the four remaining siblings set up offshore entities they would not disclose to the Internal Revenue Service. (Eldest sibling, Patricia, is not involved in this case due to her ███████████ ohn signed a false estate tax return for his father's estate  in 2001 and filed false U. S. Individual Income Tax Returns for tax years 2002 to 2008. John Seggerman takes full and complete responsibility for his actions and admits to breaking the law. His acceptance of responsibility includes fully paying his individual tax liability and penalties.

John's background and reviewing letters of those who have known John for many years track his decent behavior as a husband, father, friend, and active community member. They show that the decision John made to evade paying estate taxes is aberrant behavior compared to a lifetime of doing the right thing.

### D) John's Letters Demonstrate His Personal and Professional Qualities

Character reference letter after letter, from John's childhood babysitter to a former United States Senator then Governor, repeat that John has shown himself to be a person of high integrity and decency. Kim DiQuattro served as a mother's helper to the Seggerman family when John was a young man. She writes of John as, "…the most considerate, honest, forthright teenager I had ever known." Kim continues, "I was a camp counselor for two summers so I had dealt with a lot of teenagers. John *never* got into trouble; he was almost too perfect and seemed older than his years." John's college roommate, Andrew H. Tsao, who serves as a Managing Director of Silicon Valley Bank, where he has worked for 22 years, lists the key qualities he has witnessed in John throughout the many years he has known him.  Andrew highlights honesty and integrity when he writes, "I found John to be forthright and of good character for the many years I have known him." John's long-time friend and professional colleague, Charles Rossi Executive Vice

President and Co-founder of Azimuth Corporation, a defense contractor that supports the Department of Defense and the Services, who has known John since 1989 both personally and professionally, states that John has, "…always been sincere and honest in any interactions I've had with him." Lay professional, Day Smith Pritchartt, who has served most of her adult life in the Episcopal Church, served in John's parish from 2009 to 2015. While at John's church, St. Andrew's Episcopal Church, Day worked as "Family Minister" and focused on leading weekly worship service for parents and young children. Day notes that John was an active, positive participant in this worship group with his son, █████ From this relationship, Day eventually came to ask John to serve as her realtor to first rent then sell her condominium. Working on both transactions with John, Day notes, "His commitment to integrity, as well as his work ethic, was apparent on both occasions." After attending several real estate client appreciation events, Day states, "Stories of [John] going 'above and beyond,' and of successful results, were common."

John's good friend and long-time real estate client, Lauren Camilli, has known John for over 10 years. Passing the bar in 2000, Lauren spent most of her legal career focused on "helping companies do business ethically". She has held in-house counsel positions where she focused on ethics and compliance at large international aerospace and defense companies. In June 2019, Lauren starts as General Counsel and Corporate Secretary of Blumont, an international development nonprofit focused on helping vulnerable populations worldwide. Lauren's entire professional career is ethics centered, and as she writes in her letter of support of John, her personal life reflects that same moral integrity in her personal relationships:

> I am not writing this letter because I feel any obligation to do so and I would never write a letter for someone that would in any way compromise my personal sense of ethics or my moral compass. I am writing this letter because I feel strongly that John is one of the most trustworthy and honorable people that I have ever met, and I am honored to have the opportunity to let you know the type of

man that John is today…I never had even one second of doubt that
John is completely trustworthy and has a strong moral character.

Deborah M. Brayton, former Legislative Director in the Washington, D.C. office of U. S.
Senator Lincoln Chafee from 2000 until 2007, to whom John reported directly for several years,
describes John as someone who was, "…consistently well prepared, honest and respectful in his
dealings with both elected officials and colleagues." John worked for Lincoln Chafee when he
was a United State Senator from Rhode Island (1999 to 2007). Chafee also served as the
Governor of Rhode Island from 2011 to 2015. While a U.S. Senator, Chafee served on the Senate
Foreign Relations Committee and eventually rose to be the third ranking Republican on the
Committee. Of John's role when he worked for Chafee, Chafee states, "John Seggerman was my
top staff person for these committees…All my experiences with John Seggerman were of the
highest quality." Reverend Stephen E. Rorke, an Episcopal Priest, who has served as Interim
Rector of four Episcopal Churches in the last five years, speaks of John as, "…a faithful and
active member of St. Andrew's Episcopal Church in Arlington, VA" who, "…works honestly
and honorably in his work to sell real estate. Through the church he has demonstrated a
commitment to the community by providing food to the local food bank."

Chairman of the Board and former Director and Chief Operating Officer of Chemonics
International, Inc., Ashraf W. Rizk, has had John as his real estate agent on four separate
transactions and has referred John to five family members who have also had success in working
with him. Ashraf states, "In sum, over the course of many years, I have come to respect John
Seggerman as an honest and competent professional…His business practices are beyond
reproach; he is honest, competent, thorough and reliable." Founder and current managing broker
of the residential real estate brokerage Keller Williams Realty in Falls Church, Virginia, Steven
P. Gaskins, notes he has known John for over 14 years. Steven was John's managing broker

when the two worked together in 2005 at another real estate firm. John has been working with

Steven at Keller Williams Realty since March 2016, and Steven states:

> …what is most notable about John is his commitment to doing
> things right and playing by the rules. I regularly refer to John as
> my most cautious agent. Any time there is even the slightest
> question of whether there may be something questionable or wrong
> in a transaction, John will come to me to ask for my counsel. At a
> brokerage firm which runs a very tight ship on these matters, I
> cannot think of another agent who is so committed to proper
> ethical and legal conduct.

Steven gives a specific example that speaks to John's intrinsically honest nature. Several

years ago, John was given a cash gift from a loan officer in response to a successful home

refinancing transaction. Steven explains:

> Sensing impropriety, John immediately phoned me to ask what to
> do. I consulted with legal counsel and advised John to return the
> cash. John then drove directly to the loan officer's personal
> residence in the outer reaches of the Maryland suburbs to
> personally return the gift. This experience is a perfect illustration
> of the type of agent we have in John.

Steven Gaskins closes his letter to the Court saying:

> It comes as no surprise to me that at least five (5) clients of John in
> the recent past have known of his legal situation before your court
> but hired him nonetheless. Like me, they know him to be
> dedicated, hardworking and a man of integrity.

**E) John is a Devoted Father, Husband and Friend**

John Seggerman's is a devoted husband and father. John's father was not a father.

Because John spent close to 12 years working through the dysfunctional challenges and scars of

his upbringing, today John is a loving, supportive husband and father. Nearly every letter written

on John's behalf attests to this. Joseph Tarantolo, M.D., John's former psychiatrist, with whom

John worked from 1999 to the beginning of 2011, witnessed firsthand John's development and

growth, "In a word I am in awe of the progress [John] has made over the years…In sum I am

proud of the work he and I did together. I believe he has a great deal to offer as father, husband, and citizen." John's sister-in-law, Sarah J. Teck, who holds a PhD in ecology, evolution, and marine biology from the University of California, Santa Barbara, and has spent many extended weekends and weeklong family visits with John, Patricia, ████████████████ states, "…John is a loving and dedicated husband, father, uncle, friend, and community member." She describes her brother-in-law as someone whose, "…presence enriches the lives of my sister, my two nephews, my two sons, my husband, me, and our family as a whole". Sarah describes John as someone who has a, "…quiet, loving nature." Sarah continues, "As a realtor, [John] has to be on-call for his clients 24-7…While all this is going on, his family is a priority too. He takes time to be with his children…" Ashraf Rizk highlights the time John, Patricia, and their eldest son, ████████ pent the weekend at his home when he writes, "[John] spent the time in Naples taking care of their son full time and working at his real estate business around this." Patrick Louppe, John's mother's cousin, notes, "For about the past 10 years, I've lived in the next town over from John and his wife and kids and see them frequently. I know him to be a devoted parent and a good husband." Patrick continues, "Watching [John] with his older son is a joy—it is obvious that he's 'doing it right' and I'm confident it will be the same with his newborn." John's former babysitter, Kim DiQuattro, who thinks of John as, "…one of my dearest friends", says, "I know he is committed to his family…" Episcopal Church lay professional Day Smith Pritchartt writes about her experience working closely with parents at St. Andrew's weekly worship service for parents and children to worship together. Day writes of the goal of this service, "…to help parents become faith leaders in their families, so the program was highly interactive and participative". Day states:

> I believe that this setting gave me profound insight into the
> character of the parents, and John Seggerman was among the

> parents I respected most highly…The setting frequently called for
> personal articulation of values from the adults who were
> present…John's commitment to his (then only) son was
> heartwarming, especially in a context where maternal leadership is
> more common.

Family friend, Margaret-Rose Sales, who has known John and Patricia for almost 8 years, states, "I have spent holidays, vacations, and numerous hours socializing with John and his family and have seen him firsthand as a supportive husband and father." She has seen John as "…a hands-on dad who loves helping his eldest son ███████ ractice baseball and soccer and who dotes on his newborn son ███████ Sarah Louppe Petcher, John's first cousin, once removed, also notes that John, "…is a loving husband, and caring father to two young boys. I have personally observed him interacting with all of his family, and I believe that he cares deeply for all of them." She continues, "He remains involved with his oldest son's sporting activities, and participates in all aspects of home life." LeeAnn Flynn Hall, a Clerk of Court of the United States Foreign Intelligence Surveillance Court who has spent her career in the federal judiciary, has known John since he started dating Patricia. LeeAnn was a close friend of Patricia's parents and has known Patricia since she was a young teen. Observing Patricia and John, LeeAnn states, "John and Patricia are wonderful partners and loving, caring parents. I love to listen to ███████ adventures he has had with his Dad." Remembering Patricia's father, Bruce, LeeAnn notes, "I can honestly say Bruce would be proud of the husband and father John has become." College friend, Karin Walsh Rutledge, a Foreign Affairs Officer with the United States Department of State, who knows well of John's strained relationship with his family of origin, notes of John:

> Despite the difficulties with his family, John established a
> wonderful family with his marriage to Patricia and the birth of his
> two sons. John has been a dedicated and committed husband and
> father and has worked hard to in the real estate industry to support
> his family.

John's wife, Patricia, who writes to the Court highlighting many aspects of her husband, describes John's role as a father as, "…a very involved dad. He makes time to help out at home, and he teaches ███ so much about so many things, especially about integrity and caring for others." Patricia continues, "One of the greatest pleasures I have in life is watching John and ███ bond, especially while doing charitable activities. He takes ███ make sandwiches for the homeless at our church. They also work in our church's vegetable garden…which feeds the hungry in our community."

### F)  John is a Contributing Member of His Community

John is a strong family man who is devoted to his wife and ███ He is also a committed community member. First through his church, St. Andrew's Episcopal Church in Arlington, Virginia, John has been active for several years with a variety of church programs aimed at efforts to alleviate hunger. Two years ago, he organized and led the parish's participation in Stop Hunger Now, now called Rise Against Hunger. He and his son ███ help make sandwiches for the local homeless population, and he is frequently active in the church's Plot Against Hunger program, the church's vegetable garden that grows and donates produce for the Arlington Food Assistance Center. In addition, he has served as a lay leader on the church's Vestry to which the Reverend Dr. Jennifer G. Montgomery notes, "I want to attest that John Seggerman honorably fulfilled each of [the vestry] requirements during his 3.5 years of serving in this capacity."

John is also an active volunteer in the Arlington community. He serves as a Director on the Donaldson Run Civic Association. The association represents the neighborhood in matters that come before Arlington County Board, such as a neighborhood traffic safety initiative to help make busy streets safer for children and pedestrians. John also serves as his neighborhood's

representative on Arlington County's Neighborhood Conservation Advisory Committee ("NCAC") which authorizes neighborhood improvement projects such as sidewalks and park improvements. When a close friend of John's, Tim Johnson, passed away due to ████████ ████████ John joined the steering committee to help organize a fundraiser in Tim Johnson's honor to raise money to combat ▌████████ He also takes part in Keller Williams Realty's annual "Red Day" when all Keller William agents take a day off work to give back to their respective local communities. This year, John worked at a nearby community center that offers after school activities for children from low-income families.

In addition, John spent close to 20 years working on Capitol Hill as a public servant, and as his college friend, Karin Walsh Rutledge, points out:

> During this time, the salaries of Hill staff were very, very low and more money could be made in other pursuits. For John, being involved in politics and serving his country was more important than making money.

Highlighting the valuable contribution John made when working for Senator Lincoln Chafee in the run up to the war in Iraq through the days following September 11, 2001, Deborah Brayton, former Legislative Director in Chafee's Washington, D.C. office, states, "John's sense of duty was a constant in the office…I have enormous respect and appreciation for all that John has done to serve his nation…" From the start of his career on the Hill to the role John plays as an active church member working to serve those in need in his community, John demonstrates a strong commitment to his community. And recently John volunteered with Northern Virginia Family Service, a nonprofit which provides a range of services to help empower individuals and families to improve their quality of life and to promote community cooperation and support in responding to family needs. There he provides administrative support to the organization to help them in the work they do to support the most vulnerable in the community.

Those who have known John for years, worked with him, served with him, socialized with him, and lived with him all paint the same picture of someone who is an honest, hardworking man of integrity, a loving, devoted husband, a kind, caring, committed father, and an active community member trying to make life better for others. John Seggerman is a good person. And yet, somehow, he agreed to break the law along with members of his family of origin. Why? His wife, Patricia, who knows John through and through, eloquently states:

> As the youngest of six children, John was often left to his own devices and constantly was bullied by one of his siblings in particular. John spent many years as an adult in therapy, a productive endeavor, whereby he learned how to think for himself and speak up for himself. I believe he has taken complete responsibility for his emotional health in the best way any person could, given the family background from which he came…In his family, as the youngest, he was viewed and treated like a wallflower. He was not one to make waves or cause more problems than already existed in his family.

John's siblings all agreed, and John, knowing it was wrong, still went along with his siblings' plan. John dealt with depression for many years and experienced two debilitating mental breakdowns during these years of grappling with depression. He then spent over 10 years in therapy with Dr. Joseph Tarantolo, who describes John's therapeutic journey in the following way, "…John's descent into this psychological hell was necessary for him to find himself, a 'true self'". Again, before John did indeed find his "true self", a self of strength and with a willingness to speak up for himself, John's father died. When he died in May of 2001, he left behind his wealth. A few months after Harry Seggerman's death, John and his siblings and two attorneys met to discuss the father's estate, and the group chose an illegal course of action.

Co-workers, friends, family members and loved ones attest to knowing John to be that good citizen, husband and father. They share stories of John living his life the right way. Being the man he is today, John will never again stray from his values and his inner moral compass. He

will do whatever is necessary to right the wrongs of his past. One step he has taken is to seek volunteer work with Northern Virginia Family Service and respectfully asks the Court for a sentence of probation with community service with this nonprofit organization.

## IV.
## THE AVAILABILITY OF PROBATION

In every case, the Court must "give fair consideration to the Guidelines before imposing sentence, but in the end, it must make an 'individualized assessment' of the sentence warranted by §3553(a) 'based on the facts presented'." *United States v. Jones,* 531 F.3d 163, 170 (2d Cir. 2008) (citations omitted). *See also United States v. Cavera,* 550 F.3d 180, 188-89 (2d Cir. 2008) (en banc). In this process, "[t]he Guidelines are not only not mandatory on sentencing courts; they are also not to be presumed reasonable." *Nelson v. United States,* 555 U.S. 350, 352 (2009) (emphasis in original). Indeed, the Court "may vary [from the Guideline ranges] based solely on policy considerations. *Kimbrough v. United States,* 552 U.S. 85, 101 (2007) (quotations and citations omitted).

In 2005, the United States Supreme Court determined that the Sentencing Guidelines should be advisory to account for the individual circumstances of each defendant. *U.S. v. Booker,* 543 U.S. 220 (2005). Thus, when determining the right sentence for an individual defendant, the Guidelines are to serve as merely one of many considerations, together with the sentencing factors in 18 U.S.C. §3553(a). *See Gall v. U.S.,* 552 U.S. 38, 50, 128 S. Ct. 586, 596 (2007) (a court must make an "individualized assessment based on the facts presented").

Among others, in determining a just sentence, a district court is to take into consideration:

> ➤ "the nature and circumstances of the offense and the history and characteristics of the defendant;"

> ➤ "the kinds of sentences available;"

> the Guidelines and any pertinent policy statements of the Sentencing Commission; and

> "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct"

After weighing these factors 18 U.S.C. §3553(a) directs the Court to impose the *minimum* sentence necessary to "reflect the seriousness of the offense, to promote respect for the law, and provide just punishment for the offense;" while taking into account the need for deterrence and to protect the public, as well as any educational or medical needs of the defendant. If the Court determines that there are multiple sentences that could "equally serve the statutory purpose of §3553(a)," the Court must, "consistent with the parsimony clause," impose the lowest possible sentence. *United States v. Ministro-Tapia,* 470 F.3d 137, 142 (2d Cir. 2006).


An analysis of the 3553(a) factors suggests that a variance from the Advisory Guidelines range and should be considered by the Court.

A)      **The Nature and Circumstances of the Offense**

It is clear from the description of the offense in this memorandum and in the Presentence Report that John Seggerman's failure to report his inheritance was an aberration in an otherwise law-abiding life. His decision to cooperate with the government, pay his taxes and pay the FBAR penalty is  proof of his desire to set things right.  In a post-*Booker* framework, such aberrational conduct is a valid basis for a variance. *See United States v. Howe,* 543 F.3d 128 (3[d Cir.] 2008) (affirming probationary sentence and temporary home confinement for wire fraud despite an 18-24 month guideline range, where appellate court construed district court to have termed the offense an "isolated mistake." This fits the context of John's otherwise long and upstanding life.

-22-

As the Court is aware, in a tax case, the government is the victim. In this case John Seggerman evaded income tax for tax years 2001 and 2004 though 2008.[2]  In the spirit of cooperation and in a desire to make his victim whole, in 2013, John repaid the entire amount of tax, interest, and an anticipated 75% fraud penalty anticipated to be owed as a result of his conduct. Before sentencing his will also pay a significant FBAR penalty.  That information is confirmed by Internal Revenue Service's records.

This case also involves the conspiracy to evade estate tax and the estate's liability for FBAR penalties. John has agreed to work with the Internal Revenue Service and his siblings to ensure the government is made whole for the evasion of estate tax and the estate's FBAR penalties. ,

B.)     **The History and Characteristics of the Defendant**

Other than his involvement in this case, John has lived his life with honesty and dignity. The character letters submitted by friends and colleagues all show that John served diligently as a public servant for several years in an ethical and professional manner. Following his dysfunctional childhood, he committed himself to therapy for a decade and now, with his young family, has found peace with himself and his surroundings. He is living a simple and humble life with his wife and two sons ████████████████ He is also the sole provider for his family. There is no chance of him ever re-offending.

---

[2]  The case involves tax years 2001 through 2009 but there was not additional tax due and owing for tax years 2002, 2003 and 2009.

**B)**      **Kinds of Sentences Available**

The Court has broad discretion in determining the sentence for John Seggerman.    As various courts have held "A sentence of probation rather than incarceration can work to promote the sentencing goal of respect for the law by illustrating a rejection of the view that the law is merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." *United States v. Bennett,* No. 8:07CR235, 2008 WL 227940, at *5 (D. Neb. May 30, 2008), *citing Gall* 552 U.S. a 47. "[P]robation is a sentence in and of itself, which may be used as an alternative to incarceration to promote respect for the law and to achieve general deterrence." *United States v. Knighten,* 919 F.2d 80, 82 (8th Cir. 1990).

**C)**      **The Need to Avoid Unwarranted Sentence Disparities**

As the attached chart of sentences imposed in offshore cases indicate, the sentence proposed, a term of probation and community service, has been used in many cases, including that of Ty Warner, the inventor of Beanie Babies, who paid an FBAR penalty of over $53 million and received a sentence of two years' probation and 500 hours of community service (Exhibit B).

Although this chart is not intended to be exhaustive of all FBAR cases, it gives the Court assurance that a sentence including community service for John Seggerman would be consistent with sentences imposed in similarly situated cases.

## V.
### A SENTENCE OF PROBATION WITH COMMUNITY SERVICE IS APPROPRIATE IN JOHN SEGGERMAN'S CASE

### A) Support for Community Service Sentences

A sentence of community service is strongly encouraged in appropriate cases. The Administrative Office of the United States Courts has observed that community service is "a flexible, personalized, and humane sanction, a way for the offender to repay or restore the community. It is practical, cost-effective, and fair—a 'win-win' proposition for everyone involved." Court & Community: An Information Series about U.S. Probation and Pretrial Services: Community Service, Office of Probation and Pretrial Services, Administrative Office of the U.S. Courts (2007), available at www.kywp.uscourts.gov/court_comm/ccmtysvc.pdf.

"Community service addresses the traditional sentencing goals of punishment, reparation, restitution, and rehabilitation ...It restricts offenders' personal liberty[,] ... allows offenders to atone, [and] ... may be regarded as ... a form of symbolic restitution when the community is the victim." *Id.* In selecting an appropriate candidate to perform community service, the Office of Probation and Pretrial Services recommends:

> ... [C]ourts can use community service successfully with a wide spectrum of offenders: corporations and individuals, first offenders and recidivists, the indigent and the affluent, juveniles and senior citizens. Not every offender is a good candidate for community service...*Courts look for offenders with personal and social stability, who are willing, motivated, and who have no history of violence.*

*Id.* (Emphasis added). John Seggerman has personal and social stability, is willing and motivated and has absolutely no history of violence.

Sentencing judges have recognized that community service can serve as a significant sanction. In a case in the Eastern District of New York, where the defendant pled guilty to

conspiracy to defraud financial institutions and others for over $100 million, former Judge John

Gleeson spoke eloquently of the value of community service:

> The prospect of a sentence that does not include incarceration, which is explicit in the papers submitted by your lawyers, is a daunting one for no other reason than it might fail to promote respect for the law which is one of the things a sentence must do for someone who participated so integrally in a fraud from, as far as your piece of it is concerned, cost financial institutions, what, $110 million.
>
>            ***
>
> In fact, you know, one might say how could, no matter how essential you were to the prosecution of the more culpable participants in this crime, how do you justify an intelligent, accomplished businessman such as yourself committing this type of crime and not being sent to jail, not being, having the punishment include that type of condemnation, the most significant form of condemnation a sentencing judge in a financial crime can mete out?
>
> But nothing should ever be out of bounds and I've struggled with your lawyer's request, struggled with it throughout the presentations I've heard here, and I conclude that a sentence that doesn't include incarceration is appropriate here. *Alternatives to incarceration exist that can carry both the community and this Court's condemnation of your conduct but channel it in a way that's more constructive, given your significant charitable works and contributions before this case, given the extraordinary timing of your cooperation and its nature....I don't think the goals of sentencing here require you to be incarcerated.*
>
> I am placing you on probation for a period of five years. One special condition of probation would be that you be in home detention for a period of six months.
>
> Another is that you perform 500 hours of community service. *It strikes me that you can do some good in your community. You already have. It seems to me you deserve it. The combination of circumstances in your case makes you worthy of serving your punishment in a manner that's a little more constructive than going to jail.*

Sentencing Transcript, *United States v. Shamilzadeh*, No. 04-CR-1094 (E.D.N.Y. Apr. 1, 2008)

at pp. 10-12.

More recently, 1 U.S. *Department of Justice Manual* (Wouters Kluwer 3d ed. 2017), Comment 1-2.000A, *U.S. Department of Justice Strategic Plan, Fiscal Years 2014-2018* (2017-3 Supplement), Objective 3.4 , includes "expanding the use of diversion programs," and states that, as one of its strategies to achieve this objective, "The Department is taking steps to identify and share best practices for enhancing the use of diversion programs, *such as . . . community service initiatives that can serve as effective alternatives to incarceration.*"

Courts have also recently been more inclined to impose sentences of probation with community service as an alternative to incarceration in appropriate cases. One of the more recent cases is *United States v. Samson*, Crim. No. 2:16-00334-JLL-1, a highly publicized case in which the Chairman of the Port Authority of New York/New Jersey pled guilty to knowingly and corruptly accepting bribes from United Airlines in exchange for favorable treatment. The government in *Samson* argued for a sentence of two years imprisonment. Nevertheless, on March 6, 2017, Judge Jose Linares sentenced the defendant to five years of probation, with 12 months home confinement, and 3,500 hours of community service over the term of probation. Another example is *United States v. Chatwal*, CR-14-00143 (E.D.N.Y. Dec. 18, 2014), in which Judge Ira Glasser sentenced the defendant, who pled guilty to providing straw donors with illegal campaign contributions, resulting in an advisory Guideline range of 46-47 months, to 1,000 hours of community service with an agency that helped youth obtain employment after imprisonment on Rikers Island.

These authorities show that probation with community service is an appropriate sentence, and these cases highlight the value to the community that first-time offenders like John Seggerman can provide.

**B) Community Service is an Appropriate Sentence for John Seggerman**

John Seggerman understands the consequences of his criminal conduct and has showed that his remorse is deeply felt and genuine; he will never re-offend. For all the reasons in this memorandum, incarceration is unnecessary to satisfy the goals and purposes of sentencing. As an alternative, we respectfully recommend a sentence of probation with community service for John Seggerman with the Northern Virginia Family Service (NVFS), headquartered in Oakton, Virginia, the nonprofit organization where John has recently volunteered.

Established in 1924 by a group of volunteers to help people in need in the Northern Virginia area, NVFS has, for more than 90 years, addressed its local communities' needs with a wide range of programs designed to deal with current problems. The organization serves a diverse community of clients, most of whom live in poverty in the following areas of Northern Virginia.

Today, NVFS provides services in the following areas:

- Early Childhood Development;
- Foster Care & Adoption;
- Homelessness & Housing;
- Health & Well Being;
- Immigration Legal Services;
- Mental Health;
- Youth Initiatives;
- Workforce Development

NVFS provides programming for families with young children, children and families in the foster care system, health care access for adults and children, referrals to low-cost dental clinics, individuals and families facing homelessness, housing assistance, legal services for immigrants, refugees and asylum seekers, culturally competent mental health care, and workforce preparedness. Each specific program targets the needs of each specified population.

Every year, NVFS empowers 34,000 individuals to achieve self-sufficiency.

For children and families involved in foster care, NVFS provides foster families in Northern Virginia and surrounding area with the tools and support needed to build caring, therapeutic relationships with children placed in foster care. Likewise, the nonprofit helps to foster healthy relationships between children and their biological parents. NVFS also offers therapeutic foster care and respite care programs. Additionally, NVFS conducts adoption home studies and offers pre-adoption finalization case management services for children available for adoption from foster care agencies in Virginia and other states.

NVFS operates an emergency 92-bed shelter in Manassas, Virginia for homeless families where over 40% of shelter guests are children. During their time at the shelter, on average 39 days, heads of families work with case managers who connect them with resources to help each family return to a life of self-sufficiency. The organization also works to prevent families from becoming homeless by providing financial aid for rent and utilities.

NVFS serves 34,000 individuals each year with staff members and a large number of volunteers. There are a myriad of ways John Seggerman could help support the vital work of NVFS. John has over 30 years of noteworthy professional work experience. He has worked with numerous Senators on Capitol Hill and is a highly successful and competent real estate broker. He is organized, detail oriented, an accomplished communicator, and has a strong desire to support others in need in his community. Thus far, he has helped with administrative tasks at NVFS, and he will assist with NVFS's Clock Tower Thrift Store in Falls Church, Virginia. Given John's level of professionalism, he could also play an important role in helping coordinate the agency's fundraisers. Through John's years of service with the federal government and selling real estate, John has amassed a large network of contacts in a broad spectrum of

businesses, industries, and government and nonprofit organizations.  With this large network, John could also help in NVFS's workforce development programs by both helping the agency's clients create resumes and prepare for job interviews and by tapping into his professional contacts to locate entry-level jobs for NVFS clients.

NVFS relies heavily on talented, compassionate, dedicated volunteers and could not provide the high level of service they do without those volunteers.  John Seggerman is the type of volunteer NVFS needs. He is a highly seasoned professional with excellent, well-honed organizational and communication skills. To serve the vast numbers NVFS serves annually, the organization must be well-run. With a sentence of probation with community service, John Seggerman could put his vast array of skills to work and assist staff and other volunteers to do the important work they do to care for those in need in Northern Virginia.

## VI.
### CONCLUSION

John Seggerman understands and accepts his criminal conduct. Based on an analysis of the section 3553(a)_ factors, his cooperation, and the facts and history of his life,  we respectfully ask the Court consider a sentence John Seggerman to a period of probation with a condition of community service. As the Supreme Court stated in *Gall*, "[w]e recognize that custodial sentences are qualitatively more severe than probationary sentences of equivalent terms. Offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty. *See United States v Knights,* 534 U.S. 112, 119 (2001) ('Inherent in the very nature of probation is that probationers do not enjoy the absolute liberty to which every citizen is entitled.') (*quoting Griffin v. Wisconsin*, 483 U.S. 868, 874 (1987)). Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report

regularly to their officer, allow unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excess drinking. U.S.S.G. § 552 U.S. at 48 (footnote omitted).

Through this sentence, John could provide a significant number of hours of valuable assistance to NVFS.

Respectfully submitted,

Frank Agostino, Esq.

Cc:
Assistant United States Attorney Dina McLeod